2026 IL App (2d) 260046-U
No. 2-26-0046
Order filed June 29, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

In re E.W. and J.B., Minors

(The People of the State of Illinois, Petitioner-Appellee,

v.

Rebecca W., Respondent-Appellant).

Appeal from the Circuit Court of McHenry County.
Honorable Carl E. Metz II, Judge, Presiding.
Nos. 22-JA-46, 22-JA-47

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's finding that the State proved by clear and convincing evidence that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare was not against the manifest weight of the evidence. As such, and because respondent does not challenge the best-interest phase of the analysis, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 2    In this case, respondent, Rebecca W., appeals from orders of the circuit court of McHenry County finding her unfit to parent her children and terminating her parental rights. For the reasons that follow, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      Respondent is the biological mother of J.B., born April 13, 2013, and E.W., born January 28, 2016. The parental rights of the father of the children were also terminated but are not at issue in this appeal.

¶ 5                          A. The Abuse/Neglect Petition

¶ 6      On April 26, 2022, the State file a petition for adjudication of wardship with respect to each child, alleging in each petition as follows. On June 18, 2020, respondent was found guilty in a criminal case of battery to her child. She was placed on two years' probation. J.B. and E.W. were adjudicated abused in McHenry County case Nos. 20-JA-9 and 20-JA-10 on July 13, 2020. The matter closed on July 28, 2021. On April 25, 2022, J.B. was observed to have a bruise near his eye, a cut below his eye, redness to his cheek, and bruising on his forearm. J.B. stated that he fell and hit himself on a dresser but further added that "it's ok, I'm used to getting hit." That same day, J.B. was examined at Good Shepherd Hospital. During the examination, additional bruises were located on J.B., including bruises on both thighs. E.W. was also examined. During E.W.'s examination, multiple bruises were found on his body, including one to his buttocks. The family had a history with the Illinois Department of Children and Family Services (Department) that included three unfounded cases against respondent for cuts, bruises, welts, abrasions, and oral injuries, one indicated case against respondent for cuts, bruises, welts, abrasions, and oral injuries, and this pending case against respondent for cuts, bruises, welts, abrasions, and oral injuries. The State further alleged that each minor: is neglected in that his environment is injurious to his welfare (see 705 ILCS 405/2-3(1)(b) (West 2022)); is abused in that his parent inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of

any bodily function (see 705 ILCS 405/2-3(2)(i) (West 2022)); creates a substantial risk of physical injury to the minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss of any bodily function (see 705 ILCS 405/2-3(2)(ii) (West 2022)); and is abused in that his parent inflicts excessive corporal punishment (see 705 ILCS 405/2-3(2)(v) (West 2022)).

¶ 7    On June 29, 2022, the minors were adjudicated abused in that the minors were at substantial risk of physical abuse. See 705 ILCS 405/2-2(ii) (West 2022). Respondent stipulated to the allegations in the State's petition for adjudication.

¶ 8                                    B. The Permanency Reviews

¶ 9    On July 25, 2022, the Youth Service Bureau (YSB) filed a report in the trial court. The report noted that respondent was cooperative with the agency. It was the second time that J.B. and E.W. had been removed from respondent's care due to physical abuse. Respondent completed an integrated assessment on May 20, 2022. She was recommended to engage in individual therapy, family therapy, parenting services, and psychiatric services. According to her integrated assessment, respondent had completed parenting classes, individual therapy, family therapy, and drug screens when her children were taken into care in 2020.

¶ 10    J.B. and E.W. were placed with their maternal grandmother, Diane W. The minors completed an integrated assessment on June 7, 2022. J.B.'s integrated assessment noted that "he had a limited attention span and would frequently blurt things out and get out of his seat to spin in circles." It was also noted that J.B. displayed heightened arousal and aggression. He often engaged in physical altercations with E.W. E.W.'s integrated assessment noted that he has an intercranial cyst that required monitoring. E.W. also experienced some increased arousal and engaged in physical play with J.B. It was noted that this play was "more aggressive than typical sibling play."

Each child was recommended to engage in therapy, participate in education programs and have education monitored closely, engage in family therapy, and receive proper routine medical and dental care. Respondent was allowed supervised visitation time with J.B. and E.W.

¶ 11 Filed with the YSB report was a family service plan dated July 19, 2022. The service plan reiterated that respondent was to cooperate with court orders regarding services and visitation, participate in any recommended services, meet with the agency monthly, and follow the recommendations from the integrated assessment.

¶ 12 On July 27, 2022, the trial court entered a dispositional order finding respondent, for reasons other than financial circumstances alone, unfit and unable to care for, protect, train, educate, supervise, or discipline the minors. The trial court determined that a permanency goal of return home in 10-12 months was appropriate.

¶ 13 On November 15, 2022, CASA filed a report in the trial court. CASA noted that E.W. reported that respondent had spent the night with them and he wanted to see her more often. CASA confirmed that respondent was not allowed unsupervised visitation or overnights. CASA also observed J.B. playing a video game and saw him stand up "from his chair in front of the TV, tilt[] his head to one side, and [spin] slowly in a circle while continuing to use the game controller and play the game." He did this approximately seven times during one visit. J.B. reported that he would like to see respondent more often as well. Additionally, CASA reported that Diane W. had stated that she was feeling "so overwhelmed" and sought help from a respite worker. She was also directed to seek help from a foster parent support specialist. Although the minors were recommended to start counseling, YSB could not find a provider for J.B. or E.W. They were on a waitlist for counseling.

¶ 14    A supplemental report was filed by CASA on December 13, 2022. The report noted that respondent physically assaulted Diane W. on November 23, 2022. Diane W. was briefly hospitalized. After the altercation, Diane W. filed for an order of protection against respondent. When the minors found out that respondent was in jail for assaulting Diane W., E.W. "started crying immediately and said they have to get her out." When E.W. asked why respondent was in jail, Diane W. reported that J.B. told him that it was "[b]ecause mom tried to kill grandma." The minors were still not in counseling.

¶ 15    On January 4, 2023, CASA filed a report in the trial court. Diane W. told CASA that since the day he was upset to find out that respondent was in jail, E.W. had not asked about respondent. J.B. told Diane W. twice that he did not want to go back to respondent. The minors still had not been enrolled in counseling.

¶ 16    A supplemental report was filed by CASA on January 31, 2023. The minors were still not enrolled in mental health counseling. Diane W. reported that she had not told the minors that respondent had been released from jail.

¶ 17    A supplemental report was also filed by CASA on February 27, 2023. The minors were reportedly "next on the list" for counseling services. The minors had not seen respondent, as their guardian *ad litem* (GAL) recommended that respondent receive mental health services before visitation resumed. Diane W. reported that she needed respite care to help her take care of the minors. J.B. was observed spinning more than four times.

¶ 18    On March 6, 2023, the parties appeared before the trial court for status. The trial court ordered that YSB prepare a written visitation plan for respondent. The matter was continued for a permanency hearing.

¶ 19    On March 14, 2023, CASA filed a report in the trial court. The minors still had not begun mental health counseling. Diane W. continued to tell CASA that she needed respite, and she and the caseworker worked out a plan for respite to begin in March 2023. Additionally, CASA supervised visitation between respondent and the minors. CASA reported that the children did not initiate affection with respondent, but both children seemed comfortable with her. E.W. described the visit as "good" and reported that he wanted to live with respondent. Diane W. reported that J.B. told her he did not want to live with respondent because she is "mean." When CASA asked about the visit, J.B. said "it was good." He told CASA that he would be okay living with respondent.

¶ 20    The parties appeared before the trial court on April 18, 2023, for a permanency review. The trial court found that respondent had made reasonable efforts towards returning the minors home. However, the trial court determined that she had not made reasonable progress towards their return home. The goal remained return home within 12 months.

¶ 21    On July 14, 2023, YSB filed an update report in the trial court. The minors were still living with Diane W. It was noted that in January 2023, the agency and Diane W. agreed that the minors needed a new placement. YSB found a foster family that would care for J.B. and E.W., but the family later decided against caring for the boys. Diane W. then changed her mind and decided she did not want the agency to look for a new placement. Diane W. continued to seek respite care, now on a weekly basis.

¶ 22    The YSB report noted that respondent was receiving therapy weekly. The agency had requested a written update with treatment goals and sessions attended but had not received that information. Respondent also needed to attend psychiatry services but had not yet begun to do so. Because Diane W. had a no-contact order against respondent, YSB was supervising child visitation.

¶ 23    On July 17, 2023, CASA filed a report in the trial court. CASA reported that the minors had not yet begun counseling. Diane W. had addressed her need for respite care with CASA and sent CASA a paper signed by Diane W. and the caseworker regarding the need for additional care. On July 14, 2023, respondent was present for a child and family team meeting. She expressed concern about the minors' medical safety due to an injury to E.W.'s foot. E.W. had a splinter in his foot.

¶ 24    On July 18, 2023, the parties convened before the trial court. The trial court ordered that YSB "shall make any and all reasonable efforts to get minors into therapy by the next court date."

¶ 25    On August 7, 2023, CASA filed a report in the trial court. The report noted that on July 17, 2023, J.B. and E.W. were removed from their foster placement with Diane W. and moved into a traditional foster placement. CASA reported that both minors were safe and comfortable in their new placement.

¶ 26    On August 9, 2023, YSB filed a report in the trial court. YSB reported that both boys had "been doing extremely well since being placed in a traditional home." They remained on a waitlist for counseling.

¶ 27    On August 10, 2023, the parties convened before the trial court. In an order entered that day, the trial court granted the parties leave to file a motion for a finding that no reasonable efforts had been made to get the minors into counseling.

¶ 28    On August 30, 2023, YSB filed a report in the trial court. The report noted that on August 28, 2023, both J.B. and E.W. started individual counseling through the YSB agency. Respondent had been visiting with the minors twice a week and it was reported that visits were going well.

¶ 29    Filed with the YSB report was a service plan dated March 30, 2023. The service plan noted that respondent did not believe there were any safety threats to her children. She alleged that the

injuries to her children when they were brought into care were a result of the minors "being rambunctious." Respondent also had criminal charges pending for attacking her mother. The service plan rated her progress towards return home as "unsatisfactory" because she was on waitlists for services due to her incarceration for domestic battery against Diane W. She had not resumed individual therapy since her incarceration. Respondent was rated as "satisfactory" regarding cooperation with the agency. She was scheduling visits, meeting with the agency, and signing consent forms as needed.

¶ 30    On September 26, 2023, YSB filed a report in the trial court. It was noted that respondent's home was free from any safety concerns. Respondent had been engaging in mental health services through counseling. She was on the waitlist for parenting services, although family therapy was not yet recommended. J.B. was doing well and had formed a close bond with his therapist in the few sessions he had been to. E.W. was also doing well and had formed a close bond with his therapist.

¶ 31    On October 6, 2023, CASA filed a report in the trial court. The CASA report noted that the minors' therapist "acknowledged the trauma the boys have experienced." The minors' foster mother and the foster mother's adult daughter told CASA that J.B. had told each of them separately that he did not want to live with respondent. Neither mentioned E.W. making similar statements. J.B. reported to CASA that he had started referring to his foster mother as "mom" on his own. CASA observed J.B. twirl his body around four times during a visit. E.W. continued to do well.

¶ 32    On October 10, 2023, respondent filed in the trial court a letter from Pioneer Center for Human Services stating that respondent had been engaged in services since August 13, 2022. It further stated the respondent had participated in weekly therapy for one hour each week and would

benefit from reunification therapy. The letter listed respondent's achieved therapy goal as: "I want to feel happier, and be the best that I can be."

¶ 33    On October 20, 2023, an updated service plan dated October 19, 2023, was filed in the trial court. The service plan evaluated respondent's progress of the return home goal as "unsatisfactory." While she had completed her individual therapy, respondent also needed to "remain consistent in her psychiatric services." Further, although respondent was engaged in mental health services, maintained appropriate contact with the agency, and consistently visited with her children, the agency determined that she needed additional time to engage in services and to demonstrate an understanding for her case involvement and how to correct the conditions that led to removal. It was further noted that respondent sometimes needed redirection during visitation with her children.

¶ 34    On October 30, 2023, the parties convened for a permanency review. The same day, the trial court entered an order changing the permanency goal to return home within five months. The court found that respondent had made reasonable efforts but had not made substantial progress towards returning the minors home. However, the trial court explicitly noted in the order that respondent's failure to make substantial progress was "[t]hrough no fault of" her own but "based on the efforts by the agency."

¶ 35    On November 28, 2023, CASA filed a report in the trial court. J.B.'s therapist reported to CASA that J.B. is "shut down" and "resistant to talk about" respondent and Diane W. CASA heard J.B. refer to his foster mother as "mom" and her adult daughter as "my sister." E.W. reported that he wants to return to respondent, but if he cannot return home, he would like to stay with his foster mother. He was not interested in having a Zoom call with Diane W.

¶ 36    On November 29, 2023, YSB filed a report in the trial court. YSB noted that respondent was set to begin parenting classes on December 5, 2023. She had also been referred to parent coaching. Additionally, respondent was found guilty on four counts in her criminal case for battering Diane W.

¶ 37    On March 25, 2024, YSB filed an updated report in the trial court. Respondent told YSB on March 15, 2024, that "she built a 'Public Broadcasting' company from the 'ground up' and started in December 2023." Respondent stated that she was the executive of the company. Her caseworker asked for proof of income but had not received it. Additionally, respondent was awaiting sentencing in her criminal case. Although respondent told YSB that she had begun psychiatric treatment, the agency was still waiting for her to provide documentation.

¶ 38    Respondent's caseworker further noted that overall respondent's visitation time with the minors was going well, but the agency had observed her ask the boys leading questions such as: "Who in the foster home taught you that," or "Was it foster mother's son?" Likewise, the agency reported that respondent would also "tell the boys information that could be described as conspiracies such as: 'the moon landing was faked, all water has chemicals that cause cancer and that drinking water is made with toilet water, that China bleaches garlic in sewer water, and that the wave frequencies from apple watches are bad for you, or" that "grapes are bad for you and it is in the DNA of the fruit." When J.B. mentioned that he wanted to join the military when he was older, respondent stated, "you should not do that and that as soon as you sign up the government owns you and gives you like 20 shots, and you don't know what is in it." YSB further stated that respondent "has been observed to blame others (her mother) for the current situation and does not seem to take accountability for the reason the case opened."

¶ 39    Also on March 25, 2024, YSB filed a service plan dated March 8, 2024, in the trial court. The service plan noted that respondent had shown growth in her parenting with the minors after attending parenting classes. She also refrained from using physical punishment during her supervised visits. Respondent had been in communication with the agency and engaged in recommended services. However, she was still waiting to begin family therapy as it was not yet recommended based on the minors' individual therapy sessions. Additionally, respondent still had not shown an understanding of how her mental health affects her and her parenting.

¶ 40    On March 27, 2024, CASA filed a report in the trial court. CASA reported that the minors seemed comfortable with respondent during their visits with her. "They were goofing around with each other, laughing, and accepting hugs from" respondent. During one visit, CASA observed J.B. spin his head from a seated position "at least 15 times during the visit." CASA also observed respondent ask E.W. multiple times if he was being bullied at school. She continued to ask, "until he eventually told her yes." Later, when the foster mother asked E.W. if he was being bullied, he told her that he was not.

¶ 41    On April 4, 2024, the parties convened for a permanency hearing. Following the hearing, the trial court found that respondent had made reasonable efforts towards returning the children home but that she had not made reasonable and substantial progress towards return home of the minors. The trial court noted in its order that respondent was "in need of outstanding services and meaningful engagement."

¶ 42    On June 25, 2024, YSB filed an updated report in the trial court. The report noted that J.B. wrote a letter to his casework team on June 3, 2024, stating as follows:

> "I just wanted to ask if I have to go on visits. I don't want to go on them and I don't think [E.W.]'s mom wants me to go, either. She says mean things about me and I dont [*sic*]

feel safe around her. She says that I put her through so much and that I am evil. She also called me the Antichrist and that she wouldn't take [*sic*] if 'they' paid her. She also, also [*sic*] says that I am brainwashed by [the Department] and that you are the largest child trafficing [*sic*] group in the world."

J.B. reported that respondent stated the above to him at a visit on May 30, 2024, which took place at a park. Respondent and the boys were playing basketball and tennis and were out of earshot of the caseworker supervising the visit. J.B.'s therapist spoke with J.B. about the letter and made a therapeutic recommendation that J.B. not visit respondent due to the emotionally abusive nature of her comments towards him. A YSB supervisor invited respondent to a Zoom meeting on June 6, 2024, to discuss some of the agency's concerns. Respondent refused to attend the meeting unless she could record it, which the agency did not consent to.

¶ 43   Additionally, respondent indicated that she would be unavailable for visits from May 1, 2024, to May 17, 2024, because she was accepted into the "Chickadee Cancer trial" and would be in a laboratory. When a YSB supervisor asked if respondent had cancer, respondent replied, "Thank you for your concern but with hippa [*sic*] I am protected from having to share my personal medical information with you. But if there is a concern of impending death I'll be sure to let you know." Later, respondent emailed the supervisor, stating "Also, I thought it was clear from the fact I did not attend the days of the Chickadee trial that I did not actually do that one. Guess not so I refute the false claim made *** that I participated in that trial, and I will no longer answer any questions regarding violating my own HIPAA rights to try and keep you informed."

¶ 44   The YSB report updated respondent's treatment plan to require that she "acknowledge and demonstrate an understanding of her children's feelings regarding their statements of experiencing physical abuse." In order to achieve this goal, respondent needed to participate in family therapy

when deemed appropriate, complete a psychological evaluation and follow all recommendations, complete a mental health assessment, and provide an updated prescription medication list. Also on June 25, 2024, YSB filed a family service plan dated June 20, 2024, consistent with the report.

¶ 45 On June 25, 2024, CASA filed a report in the trial court. The minors' foster mother reported that at times E.W. could be "mean" towards J.B. She noted that this behavior mimicked what J.B. said happened at home with respondent. The boys' therapist was aware of the behavior. J.B. told CASA that he feels "safe and welcome" in his foster home. He reported that he went to visits with respondent because it was something they had "always done," but that he did not look forward to the visits. J.B. told his therapist that he did not think respondent would hit him, but that he had the "same feeling that he had when he was worried about getting hit." J.B.'s therapist reported that J.B. was "relieved" to know that he no longer needed to attend visitation. CASA also noted that J.B. continued to "twirl." His therapist "stated the twirling is typical of the random physical abuse [J.B.] endured and this behavior might be extinguished over time with reminders."

¶ 46 On September 27, 2024, CASA filed an updated report in the trial court. J.B. reported to CASA that "he feels good about his decision to not go to visits with [respondent] and does not think he will ever want to visit [her] again." However, J.B. later stated that he is considering visiting with respondent. The foster mother stated that respondent wrote J.B. a letter but she was waiting to show it to J.B. until he could discuss it with his therapist. E.W. continued to attend visits with respondent.

¶ 47 On September 30, 2024, YSB filed a report in the trial court. The report noted that the case passed legal screening for termination of parental rights on September 24, 2024. YSB requested a permanency goal change to substitute care pending termination of parental rights. It was noted that J.B. had not visited with respondent since May 2024. Additionally, respondent was still awaiting

sentencing in her criminal case where she was found guilty of four counts of battery, including aggravated domestic battery causing great bodily harm and aggravated battery of a victim 60 years or older, after she kicked her mother in the face. Respondent told YSB that she believed that all her charges were going to be "dropped."

¶ 48　According to the YSB report, respondent had been successfully discharged from individual therapy but felt open to restarting therapy. When her casework team asked respondent what had changed in her life since the children were first removed from her care, she responded that "everything is different" and that she "understands the cycle of abuse." She told her casework team that from parent coaching she had learned "that consequences are not always needed." Respondent stated that she had no insight to the "abuse that occurred to the children," and that J.B.'s injuries were a result of him falling into a dresser. When asked what her treatment goals were in therapy, she claimed it was to "overcome PTSD." Respondent further alleged that she had undergone a psychological evaluation but did not provide documentation.

¶ 49　Respondent had completed parenting classes. A report from her first session identified several areas of concern including favoritism, power struggles, distrust, conspiracy thinking, negative comments, and inconsistencies. YSB indicated that although respondent "has completed several services, she has not demonstrated that she can safely parent her children."

¶ 50　Attached to the YSB report was a parent coaching report from ROAN Solutions. It noted that respondent reportedly blamed J.B. for the State's involvement in this matter. The report further addressed several instances highlighting YSB's concern that respondent demonstrated favoritism towards E.W. For example, when J.B. did not attend a visit, respondent and E.W. "occasionally discussed him in a way that highlighted [E.W.]'s perceived superiority." Once, E.W. slipped on the floor and respondent stated, "[J.B.], oh wait, [E.W.]. You pulled a [J.B.], so I called you [J.B.]."

On a separate occasion, respondent told E.W. of J.B., that "You're better than him," to which E.W. responded "I know."

¶ 51    The ROAN parenting report also noted that respondent perpetuated power struggles with her children. For example, while playing games with E.W., respondent occasionally used "banter that included passive aggressive undertones" and was not reflective of friendly or respectful competition. Further, E.W. often exhibited distrust towards respondent. He often sought reassurance from the parent coach or case aide to confirm the accuracy of respondent's statements.

¶ 52    Regarding respondent's "conspiracy thinking," the ROAN report indicated that "the biggest concern is how she shares those opinions and the tone she often uses." For example, when E.W. was playing on a playground, respondent told him that the playground mulch was "dangerous and [he] shouldn't touch it," because it "causes cancer and is extremely toxic." She did, however, continue to let him play on the playground. When E.W. wanted to play a game that involved her catching a ball that he rolled down a slide, respondent told E.W. that she didn't want to play because she didn't want to touch the ball or for her hands to touch the ground. She told him that the rubber "has chemicals in it that can cause Leukemia." ROAN noted that although "her 'conspiracy thinking' is not a physical safety concern, there is an undertone of a negative connotation in her statements of 'look what I did for you, even though I'm against it,' or 'I'm a better person than you' or even 'You are a bad person.' "

¶ 53    Also attached to the September 30, 2024, YSB report was a family service plan dated September 27, 2024. The service plan noted that respondent had been diagnosed with ADHD and prescribed Vyvanse. She reported that she is supposed to take the medication daily. However, not all her drug tests were positive for amphetamines, as would be consistent with daily usage. She stated it may be possible that she missed a few days of her prescription.

¶ 54    On October 3, 2024, the parties convened before the trial court. After a permanency review, the trial court found that respondent failed to make reasonable efforts toward returning the minors home. The trial court likewise determined that respondent failed to make reasonable progress toward returning the minors home. Accordingly, the permanency goal was changed to substitute care pending termination of parental rights.

¶ 55    On December 9, 2024, the State filed a petition to terminate parental rights with respect to both minors. The petition alleged that respondent is an unfit person to have a child in that: (1) she has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children (750 ILCS 50/1D(b) (West 2024)); (2) she has failed to protect the minors from conditions within their environment injurious to their welfare (750 ILCS 50/1D(g) (West 2024)); (3) she has failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors in any nine-month period after the adjudication of neglect on June 29, 2022 (750 ILCS 50/1D(m)(i) (West 2024)); (4) she has failed to make reasonable progress toward the return of the minors home within a nine-month period after the adjudication of neglect on June 29, 2022 (750 ILCS 50/1D(m)(ii) (West 2024)); and (5) she has demonstrated an intent to forgo her parental rights as manifested by her failure for a period of 12 months to maintain contact with or plan for the future of the children, although physically able to do so (750 ILCS 50/1D(n) (West 2024)). With respect to allegations (3) and (4) the State listed the following nine-month periods: June 29, 2022, through April 18, 2023, April 18, 2023 through December 31, 2024, January 1, 2024, through October 3, 2024, November 1, 2022, through February 2023, and April 4, 2024, through October 3, 2024, and any other nine-month period from June 29, 2022, through October 3, 2024.

¶ 56                     C. The Termination Proceedings

¶ 57    The hearing on the State's petition for termination of parental rights began on June 24, 2025. In addition to the following testimony, the State submitted into evidence: a certified copy of respondent's conviction of battery against Diane W.; a ROAN parent coaching report; DCFS investigation documents for respondent's prior allegations; the DCFS integrated assessment and service plans; and the YSB court reports.

¶ 58    The State first called Julie Traskaski to testify. Traskaski testified that she is a parent support specialist and team lead with ROAN Solutions. She has worked at ROAN's McHenry County visitation house since it opened in April 2021. She further testified that in April 2024, respondent was referred to ROAN for parent coaching. This consisted of six in-person one-on-one coaching sessions. Respondent participated in all the sessions with one child, E.W. After respondent completed her parent coaching, Traskaski prepared a report. As part of that report, she recommended that respondent's parenting time continue to be supervised.

¶ 59    On cross-examination, Traskaski testified that she recommended respondent receive a psychological evaluation. This was a recommendation she typically made when other methods of achieving reunification, such as individual therapy or family therapy, are ineffective. She further testified that it seemed respondent's interactions with E.W. were generally positive. However, there were several instances where the interactions between respondent and E.W. were passive-aggressive in nature and Traskaski felt the need to intervene. Traskaski opined that respondent had a "thinking error" with respect to conspiracy theories. Traskaski explained that the problem was not necessarily respondent's beliefs, but that respondent shared her beliefs in a way "that can be very frightening for a child to hear."

¶ 60    The State next called Aaron Villasenor to testify. Villasenor is an investigator for the Department. On November 23, 2022, he was assigned to investigate a case regarding respondent, J.B., and E.W. It was reported that respondent showed up unannounced to the home of her mother, Diane W., when Diane W. was fostering J.B. and E.W. Respondent became physically aggressive with Diane W., "causing severe injuries that resulted in her being admitted to the hospital, displacing the children at that time temporarily to the great-grandfather." As part of his investigation, Villasenor learned that respondent had been involved with six other investigations regarding E.W. and J.B.

¶ 61    The State then called Dionca Harper, a supervisor for the Department. Harper testified that prior to becoming a supervisor, she was an investigator for the Department. On April 25, 2022, Harper was assigned to investigate a case involving respondent, J.B., and E.W. Harper testified that she first met J.B. at his school after he was reported to have injuries. She initially observed bruise-like injuries to his face. Later, she discovered bruising to his arm and thigh. J.B. first told Harper that he fell into a piece of furniture but later changed his story and told her that he fell at the park. Harper then spoke with E.W. When she asked E.W. about forms of discipline used by respondent, "he immediately shut down." She explained that E.W. had been responding to her questions until that point. Harper asked E.W. about the park, but he told her that the family had not visited a park in two years. During a health screening, injuries were also discovered on E.W. Harper's investigation led to an indicated finding of abuse for cuts, welts, and bruises. On cross-examination, Harper testified that J.B. denied that his mother ever hit him.

¶ 62    Following the testimony of Harper, the State called Officer Heather Rowlett to testify. Rowlett is a police officer for the Village of Huntley. Officer Rowlett was working on the night of November 23, 2022. She responded to a call from Diane W., who reported that she had been

battered by respondent. When Officer Rowlett reached Diane W., she observed that Diane W.'s right eye was "swollen, red, black and blue." Diane W. also had a bruise and swelling on her right hand and forearm. Officer Rowlett opined that these injuries were consistent with Diane W.'s statement that respondent had battered her. On cross-examination, Officer Rowlett stated that she only interviewed Diane W.

¶ 63    The State next called Kelly Scott to testify. Scott is an intact supervisor for YSB. Prior to her role as an intact supervisor, Scott worked with YSB as a placement supervisor. She was the placement supervisor in respondent's case. Scott testified that respondent was recommended to complete services based on an integrated assessment. Those services included individual therapy, family therapy, parent coaching, and psychiatric services. Towards the beginning of the case, respondent was engaged in mental health services including individual therapy and psychiatric services. In late November of 2022, her progress with these services was disrupted due to her arrest. Respondent did not engage in services while she was incarcerated. Thus, she did not resume engaging in her services until February 2023. Throughout the time that Scott was supervisor in this case, respondent was never allowed unsupervised visitation with the minors. On cross-examination, Scott testified that respondent was an actively engaged mother with respect to reports about how the children were doing, although she had not completed her services.

¶ 64    The State next called Jessica Bartlett to testify. Bartlett is the foster care supervisor for YSB. She supervised respondent's case. Bartlett testified that respondent was recommended for a psychological evaluation. She did not obtain the evaluation. Respondent was also recommended for a new mental health evaluation and individual therapy. Bartlett explained that respondent needed to reengage in therapy because the goal stated from her original therapy report was that respondent was trying to become happier and the best version of herself. Bartlett opined that this

was not relevant towards the goal of respondent acknowledging the physical abuse that occurred to the children. Additionally, based on drug tests, respondent was not consistently compliant with her prescribed medications. Further, respondent was never recommended to have unsupervised visitation with the children because the agency had not seen any changes in her behavior while the case was in care. Respondent refused to acknowledge that any abuse occurred. Bartlett testified that respondent did complete some services, including parenting classes, parent coaching, and psychiatric care. However, Bartlett testified that she was concerned about respondent's "conspiracy type statements" because they "could instill fear and distrust in the children" and might be indicative of "underlying mental health concerns."

¶ 65    The State next called Courtney Jones, a caseworker with YSB. She worked as a caseworker in this matter from May 2024 to July 2025. Jones testified that during the pendency of the case, respondent was not recommended for family therapy because the children's therapist did not believe it to be appropriate. Respondent also did not receive a psychological evaluation or an updated mental health assessment and was not compliant with her medications. Respondent had completed her parent coaching; however, YSB was still concerned that respondent was not fit to parent. Jones opined that this was due to the power struggles witnessed between respondent and E.W., her favoring E.W. over J.B., and her making inappropriate statements. J.B.'s therapist recommended that J.B. not see respondent at all, as respondent referred to J.B. as "the antichrist" and blamed him for the children being placed in foster care.

¶ 66    On cross-examination, Jones testified that respondent did ask her for a referral for a psychological evaluation, but that she did not refer respondent for the evaluation at that time. She explained that she did not witness favoritism displayed by respondent toward E.W., but that the case aides who oversaw visitation noted it. Jones testified that one of her main goals for respondent

was "[j]ust taking responsibility for the reason the case came into [the Department's] care. Recognizing. Just like changing behaviors that were seen. Those type of things usually progress the case along." After the close of Jones's testimony, the State rested its case.

¶ 67    Respondent then called Melanie Plant to testify on her behalf. Plant is a caseworker with YSB. She worked on respondent's case for approximately seven months, from October 2023 until May 2024. Plant could not recall any occasions when respondent missed visitation with her children during that time frame. Respondent also showed concern for the children's welfare. However, Plant also testified there were times when she observed respondent demonstrating inappropriate behavior with the children. Plant recalled one visit where respondent brought a painting and told the children that there were "evil devils in [the] painting." She then pointed out the images she believed were devils in the painting. Plant also recalled that respondent would tell the children things like "garlic is bleached by China," "the moon landing was fake," or "chemicals in water cause cancer." Plant opined that these conspiracy theories negatively impacted J.B. and E.W. For example, the boys were left with "a lot of questioning and uncertainty" as to whom they could believe. Sometimes the boys would ask to research the veracity of respondent's statements.

¶ 68    On cross-examination, Plant testified that she investigated whether the children were being bullied at school due to respondent's concerns. Neither J.B. nor E.W. was being bullied. Respondent also raised concern that J.B. and E.W. had certain health issues, but not all of these concerns were founded. For example, respondent reported that the children needed inserts for their shoes so that they wouldn't fall over. The children saw a doctor who reported that the inserts were unnecessary. Respondent reported that J.B. had an infected scratch, although it was not actually infected. Plant further described that during visitation there were times when respondent would tell the boys something, and the boys would immediately turn and look at Plant, seemingly because

they trusted her but not respondent. Plant recalled that J.B. more often questioned respondent. On re-direct examination, Plant recalled an instance where respondent believed J.B. had frostbite. Plant conceded that J.B.'s hands were chapped but noted that the doctor said it was dry skin.

¶ 69    Respondent next called Mariza Jacquez to testify. Jacquez supervised interactions between respondent and the two boys. Jacquez did not believe the interactions to be inappropriate. Jacquez opined that respondent seemed reasonably concerned with the welfare of J.B. and E.W. On cross-examination Jacquez explained that she was unsure why J.B. stopped attending visitation with respondent.

¶ 70    Respondent then called Nichole Payuk to testify. Payuk worked as a supervisor of visitation on this matter. Payuk recalled that visits with respondent were appropriate, and she did not recall respondent demonstrating any unusually aggressive behavior. She believed the visits went well and did not remember having to correct respondent's behavior.

¶ 71    Additionally, respondent called Miriam Danda to testify. Danda also supervised visitation for YSB. She provided transportation to visits for respondent on two occasions. On the first occasion, she recalled that respondent's home was clean and that respondent appeared happy to see the children. She observed that E.W. and respondent had a strong bond. Danda did not recall any inappropriate behavior by respondent.

¶ 72    Respondent next called Dr. Genevieve Roig. Dr. Roig has a Ph. D. in counseling. Respondent began counseling with Dr. Roig in October 2024. Dr. Roig testified that she and respondent discussed matters relating to the case, but their sessions mainly focused on ways for respondent to manage life without her children and on many aspects of her mental health alongside the proceedings and preparation for court. She stated that respondent repeatedly expressed that she wished to be reunified with her children. Counsel for respondent additionally proffered testimony

of Dr. Roig, indicating that she would further testify that respondent did not wish to relinquish her parental rights and that respondent was always appropriately concerned with the welfare of the children.

¶ 73 Finally, respondent recalled Jones to testify in her case in chief. Jones testified that although she scheduled respondent for drug and alcohol tests, she did not recall having any specific concerns relating to respondent's use of drugs and alcohol. On cross-examination, Jones testified that respondent had one positive drug test for amphetamines. However, respondent was prescribed medication that would yield a positive drug test result for amphetamines if taken as prescribed. All other drug tests were negative.

¶ 74 On September 19, 2025, the trial court found respondent unfit and terminated her parental rights, memorializing its findings in a meticulously documented 34-page "Memorandum and Decision on Parental Fitness." The trial court found that the State had proven by clear and convincing evidence that respondent: failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of J.B. and E.W.; failed to protect J.B. and E.W. from the conditions within their environment injurious to their welfare; failed to make reasonable efforts to correct the conditions that were the basis for the minors' removal for any nine months between June 29, 2022 and October 3, 2024; failed to make reasonable progress toward the goal of return home for the same time frames; and demonstrated an intent to forgo her parental rights as manifested by her failure for a period of 12 months to maintain contact with or plan for the future of the children, although physically able to do so.

¶ 75 In its memorandum, the trial court noted respondent's stipulation in the previous abuse case, filed in 2020, that the minors were discovered to have sustained injuries (including bruises covered with make-up) that they reported were inflicted by respondent. The investigation resulted

in Department intervention, shelter care, and adjudications of physical abuse by respondent. The previous case closed in July 2021.

¶ 76    However, the Department again took protective custody in April 2022, and after respondent stipulated that both minors were found to have multiple injuries, the minors were yet again adjudicated abused and made wards of the court. In its ruling on the termination petition, the trial court concluded that services in the first matter "did not correct [respondent's] behavior or attitude" towards inflicting physical abuse upon the minors and that her actions and attitude in the second case "showed a refusal to even acknowledge [that] her actions are unacceptable." The court noted that respondent "physically abused the [m]inors a year after she had just regained custody from prior physical abuse." It also found that a few months after the second dispositional order was entered, and while the minors were present in the maternal grandmother's foster home, their grandmother was beaten and injured by respondent, a crime for which respondent was convicted and sentenced.

¶ 77    The trial court highlighted the fact that respondent "never contradicted or rebutted the acts of physical and psychological abuse she inflicted upon the Minors." It stated that, after the second adjudication, respondent "never got through her services and never achieved enough progress to be granted unsupervised visits." It opined that respondent "failed to take responsibility or accountability for her actions," and pointed out instances of respondent's failure to even substantiate claimed psychiatric treatment and proof of income. The trial court documented instances of respondent being "inappropriate during her visits" with the minors, notably an incident in which J.B. reported he no longer wanted to visit because respondent called him "the Antichrist," "brainwashed," and "evil" and complained that he had "put her through so much." Other behavior included "fabricat[ing] concerns, in front of the [m]inors" about the boys being bullied or injured

or stolen from in their foster home, engendering enmity between the minors by showing favoritism, and sowing distrust by making statements concerning perceived dangers such that the child sought reassurance from the supervising social workers. The trial court indicated that respondent's "actions in tormenting her children, physically before case filing and mentally after case filing clearly show that [she] did not maintain a reasonable degree of interest, concern or responsibility as to the welfare of the Minors." The trial court found that her "actions were so contrary to that of a mother" that J.B. did not refer to her as his mother, instead only as E.W.'s mom. It further found that the conditions in which the children were living also established that respondent failed to maintain a reasonable degree of interest as to their welfare, as respondent physically abused the children. The ruling further found respondent "failed to take reasonable steps to correct the conditions that were the basis of the removal or to take reasonable steps and achieve reasonable and substantial progress towards the return of the [m]inors after June 29, 2022, through the goal change on October 3, 2024." The court said respondent "demonstrated an inability to accept responsibility and, therefore, failed to understand what she needed to do to correct the conditions."

¶ 78 It determined that "[respondent] was the very condition that was injurious to their welfare, [and] as of October 2024, [respondent] failed to acknowledge she was the problem." The trial court also considered that respondent's testimony that she showed affection towards the minors was rebutted by testimony that she was psychologically abusive to the point where she could not visit with J.B. This, the trial court determined, demonstrated an intent to forego her parental rights.

¶ 79 Upon finding respondent unfit, the trial court scheduled a date for the best-interest phase of the termination proceedings. The trial court found it in the best interest of J.B. and E.W. to terminate respondent's parental rights.

¶ 80 This appeal followed.

¶ 81                                    II. ANALYSIS

¶ 82    On appeal, respondent argues that the trial court erred in granting the State's petition to terminate her parental rights because the findings of unfitness were against the manifest weight of the evidence. Specifically, respondent argues that the trial court's findings were against the manifest weight of the evidence when it found that respondent failed (1) to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of J.B. and E.W.; (2) to protect J.B. and E.W. from conditions within their environment injurious to their welfare; (3) to make reasonable efforts to correct the conditions that were the basis for the removal of J.B. and E.W. in any 9-month period after the adjudication of neglect; and (4) to make reasonable progress towards the return of J.B. and E.W. within any 9-month period after the adjudication of neglect.

¶ 83    It is well settled that "[W]hen parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court." *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004) (citing *In re D.D.,* 196 Ill. 2d 405, 433 (2001)). Hence, if we affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds. Accordingly, we turn to respondent's first argument, that the trial court erred in finding that respondent failed to maintain a reasonable degree of interest concern or responsibility as to the welfare of E.W. and J.B.

¶ 84    Section (1)(D)(b) of the Act allows for a finding of unfitness where a parent fails "to maintain a reasonable degree of interest, concern, or responsibility as to [a] child's welfare." 750 ILCS 50/1(D)(b) (West 2024). "In determining whether a parent has shown a reasonable degree of interest, concern or responsibility for a child's welfare, courts consider a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such

as inquiries into the child's welfare." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). In making this determination, the trial court is not limited to a specific time frame. *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000). The interest, concern, or responsibility must be objectively reasonable. *Daphnie E.*, 368 Ill. App. 3d 1052, 1064. Courts consider a parent's conduct in the context of the circumstances in which it occurs, including difficulties in obtaining transportation, the parent's poverty, conduct that hinders visitation, and motivations underlying the failure to visit. *Id*. "However, a parent need not be at fault to be unfit, and she is not fit merely because she had demonstrated some interest in or affection for her child." *Id*. If visitation was impractical, courts consider whether a reasonable degree of concern was demonstrated through letters, telephone calls, and gifts to the child, taking into account the frequency and nature of those contacts. *Id*. Courts may also consider completion of the service plan as evidence of concern, interest, or responsibility. *Id*. "Courts will consider the parent's efforts which show interest in [a] child's well-being, regardless of whether those efforts were successful." *Id*.

¶ 85 Respondent argues that because she visited with her children consistently and completed services in her service plan, she demonstrated a reasonable degree of interest, concern, or responsibility as to the children's welfare. She contends that while "the agency may have disagreed with some of her comments and statements, the evidence overwhelmingly demonstrated that [respondent] was vested in the welfare of her children."

¶ 86 But although respondent regularly visited her children, especially E.W., throughout the proceedings, this in itself was not sufficient to prove that she demonstrated a reasonable degree of interest, concern, or responsibility as to the children's welfare. See *Daphnie E.*, 368 Ill. App. 3d at 1064 (a parent is not fit merely because she has shown some interest in or affection for the child).

- 27 -

Here, the overwhelming evidence indicates an insufficient degree of interest, concern, or responsibility shown for the children.

¶ 87    Prior to the children being taken into care in the instant matter, they had been removed from respondent's care and adjudicated abused due to previous instances of physical abuse by respondent. While this case was pending, respondent was arrested and incarcerated for battering her mother, who was providing care for the minors. The physical altercation took place in front of J.B. and E.W., and J.B. believed that respondent was trying to "kill grandma." While incarcerated, respondent did not complete tasks from her service plan or visit with her children. Moreover, the children were displaced because of the altercation, as Diane W. was hospitalized briefly due to her injuries. Respondent refused to acknowledge the harm caused, and she reported that her case was going to be dismissed on more than one occasion. Despite these statements, she was convicted of aggravated domestic battery and sentenced.

¶ 88    Respondent's general refusal to acknowledge the harm she caused was referenced by the trial court in its finding that respondent failed to demonstrate a reasonable degree of interest, concern, or responsibility as to the children's welfare. Respondent did not successfully complete individual therapy because she refused to acknowledge that her physical abuse of the children was the reason they were brought into care. Rather, the objective of her therapy was listed as "I want to feel happier, and be the best that I can be." As the trial court noted, respondent never took responsibility for the abuse suffered by the children and denied it ever occurred. According to Bartlett's testimony, YSB never recommended that respondent have unsupervised visitation because she had not changed her behavior throughout the pendency of this case and she continued to deny that she had abused her children, despite her stipulations to the facts underlying both adjudications for abuse.

¶ 89    Moreover, respondent did not have consistent visitation with J.B. Respondent caused J.B. psychological harm, referring to him as "the Antichrist," blaming him for the case coming into care, and demonstrating favoritism towards E.W. After J.B. wrote a letter asking not to see respondent anymore, his therapist made a therapeutic recommendation that visitation between respondent and J.B. cease. Respondent was likewise unable to finish service plan goals such as family therapy with J.B. because of this therapeutic recommendation. As the trial court noted, her "actions were so contrary to that of a mother" that J.B. began referring to her only as E.W.'s mom.

¶ 90    The trial court also noted that respondent's conspiratorial thinking demonstrated an insufficient degree of interest, concern, or responsibility shown towards her children. Without addressing the substance of respondent's claims regarding toxic or carcinogenic materials in the food or the playground, the trial court highlighted that respondent was inconsistent with her approach towards her beliefs. She would tell the boys that the food they were eating or equipment they were playing with was hazardous, and yet she would not tell them to abstain from eating those foods or playing with said equipment. Thus, she failed to take proper precautions towards hazards she identified.

¶ 91    Based upon the facts in the record, which were largely unrebutted, we cannot say that the trial court's finding of unfitness based on respondent's failure to show a reasonable degree of interest, concern, or responsibility for her children's welfare was against the manifest weight of the evidence. Because we need only to affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds. *Tiffany M.*, 353 Ill. App. 3d 883, 891. As such, and because respondent did not appeal the trial court's decision that it was in the minors' best interest that her parental rights be terminated, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 92                                 III. CONCLUSION

¶ 93    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 94    Affirmed.